# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| MARK ALLAN WEISS, | ) | **Case No.  04-04424-TLM** |
| | ) | |
| **Debtor.** | ) | **MEMORANDUM OF DECISION** |
| | ) | |
| _____ | ) | |

## INTRODUCTION

On December 13, 2004, Mark Allan Weiss ("Debtor") filed a chapter 13 bankruptcy petition, schedules and statements. *See* Doc. No. 1. After that date, Debtor filed a series of amendments.

On January 14, 2005, Debtor filed amended schedules B, C, and I and an amended statement of financial affairs. *See* Doc. Nos. 20, 22; Exs. 20, 21.

On January 20, 2005, Debtor filed another amended statement of financial affairs. *See* Doc. No. 25; Ex. 22.

On April 21, 2005, Debtor filed second amended schedules B and C. *See* Doc. Nos. 40, 41; Exs. 23, 24.

Finally on June 22, 2005, Debtor again amended schedules B, C, I and J. *See* Doc. No. 51; Ex. 25.

On August 22, 2005, Creditors Richard Garcia, Joyce Olenik, and Tri Tech

MEMORANDUM OF DECISION - 1

Training, Inc. ("Creditors") filed a motion under § 1307(c) to dismiss or convert Debtor's case on the grounds of bad faith. *See* Doc. No. 87 (the "Motion"). The chapter 13 trustee, Bernie Rakozy ("Trustee") joins in the Motion.

After a hearing on September 28, 2005, the Court took the Motion under advisement. The following constitute the Court's findings of fact and conclusions of law as required by Rule. *See* Fed. R. Bankr. P. 7052, 9014.

**APPLICABLE LAW**

In *In re Noordam*, 03.2 I.B.C.R. 136 (Bankr. D. Id. 2003), this Court held:

> A dismissal of a chapter 13 case other than on the debtor's own request arises under § 1307(c), which provides:
>
>> (c) Except as provided in subsection (e) of this section, on request of a party in interest or the United Stats trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause [.]
>
> A statutory list of factors which can constitute cause for dismissal follows, but it is nonexclusive. *See* § 102(3) (terms "includes" and "including" are not limiting).
>
> The Bankruptcy Appellate Panel in *Ho v. Dowell (In re Ho)*, 274 B.R. 867 (9th Cir. BAP 2002) stated:
>
>> Section 1307(c) provides that a court may dismiss a chapter 13 case "for cause." The Ninth Circuit has concluded that a debtor's bad faith in filing a chapter 13 petition is cause for dismissal under 1307(c). *See In re Eisen*, 14 F.3d 469 (9th Cir. 1994). In determining whether a chapter 13 petition has been filed in bad faith,

MEMORANDUM OF DECISION - 2

> a bankruptcy court must review the "totality of the circumstances." *Eisen*, 14 F.3d at 470 (quoting *In re Goeb*, 675 F.2d 1386, 1391 (9th Cir. 1982)). A bankruptcy court should consider the following factors:
>
> > (1) whether the debtor misrepresented facts in his or her petition or plan, unfairly manipulated the Bankruptcy Code or otherwise filed the Chapter 13 petition or plan in an inequitable manner;
> >
> > (2) the debtor's history of filings and dismissals;
> >
> > (3) whether the debtor's only purpose in filing for chapter 13 protection is to defeat state court litigation; and
> >
> > (4) whether egregious behavior is present. *In re Levitt*, 171 F.3d 1219, 1224 (9th Cir. 1999).
>
> 274 B.R. at 876 (footnote omitted). *See also Cabral v. Shamban (In re Cabral)*, 285 B.R. 563, 572-73 (1st Cir. BAP 2002) (discussing *Ho* and other authorities); *In re Gress*, 257 B.R. 563, 567-68 (Bankr. D. Mont. 2000); *In re Covino*, 245 B.R. 162, 168-70 (Bankr. D. Idaho 2000); *In re Moore*, 188 B.R. 671, 678 (Bankr. D. Idaho 1995).

*Id.* at 139-40. *See also Eisen v. Curry (In re Eisen)*, 14 F.3d 469, 470 (9th Cir. 1994) ("To determine if a petition has been filed in bad faith courts are guided by the standards used to evaluate whether a plan has been proposed in bad faith.").

*Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219 (9th Cir. 1999), validates these principles. In addition, *Leavitt* makes it clear that fraudulent intent is not a prerequisite to a finding of bad faith. 171 F.3d at 1224; *accord Gress*, 257 B.R. at 568 (citing In re Powers, 135 B.R. 980, 994 (Bankr. C.D. Cal. 1991)). Instead, *Leavitt* focuses on a debtor's honesty, the omission or undervaluation of assets in a

MEMORANDUM OF DECISION - 3

debtor's schedules, the inflation of expenses found in a debtor's schedules, and the proportionate distribution of funds found in a debtor's plan compared to a debtor's assets and income. *Id.* at 1225.

Debtor bears the burden of proving that his petition was filed in good faith. *Leavitt v. Soto (In re Leavitt)*, 209 B.R. 935, 940 (9th Cir. BAP 1997) (citing *In re Powers*, 135 B.R. 980, 997 (Bankr. C.D. Cal. 1991) which stated, "[w]hile the Bankruptcy Code is silent regarding the burden of proof as to dismissals, courts have consistently held that once a debtor's good faith is in issue, the debtor bears the burden of proving the petition was filed in good faith"); *accord In re James*, 260 B.R. 498, 504 (Bankr. D. Idaho 2001) (stating that it is a debtor's burden to show good faith when there is an objection to confirmation of a plan based on lack of good faith).

Since these cases reflect that the good faith confirmation standards are or may be relevant, they should be mentioned. To be confirmed, a chapter 13 debtor's plan must be "proposed in good faith and not by any means forbidden by law." *See* § 1325(a)(3). The Court evaluates good faith under the "totality of the circumstances." *In re Hult*, 04.1 I.B.C.R. 18, 20 (Bankr. D. Idaho 2004) (citing *In re Villanueva*, 274 B.R. 836, 841 (9th Cir. BAP 2002)).[1] This Court, in *In re*

---

[1] *Villanueva* cited *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386 (9th Cir. 1982), a seminal case on the standard of good faith. *Goeb* stated:

(continued...)

MEMORANDUM OF DECISION - 4

*Johnson*, 262 B.R. 831, 01.2 I.B.C.R. 72 (Bankr. D. Idaho 2001), listed several

factors that may be relevant to a finding of good faith:

1) The amount of the proposed payments and the amounts of the debtor's surplus;

2) The debtor's employment history, ability to earn, and likelihood of future increases in income;

3) The probable or expected duration of the plan;

4) The accuracy of the plan's statements of the debts, expenses and percentage of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court;

5) The extent of preferential treatment between classes of creditors;

6) The extent to which secured claims are modified;

7) The type of debt sought to be discharged, and whether any such debt is nondischargeable in Chapter 7;

8) The existence of special circumstances such as inordinate medical expenses;

9) The frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

10) The motivation and sincerity of the debtor in seeking Chapter 13 relief; and

11) The burden which the plan's administration would place upon the trustee.

262 B.R. at 839. As *Johnson* notes, this list is "non-exhaustive." *Id.*

It is, at bottom, a fact-driven inquiry.

---

[1](...continued)

Given the nature of bankruptcy courts and the absence of congressional intent to specifically define "good faith," we believe that the proper inquiry is whether the [debtors] acted equitably in proposing their Chapter 13 plan. A bankruptcy court must inquire whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner. Though it may consider the substantiality of the proposed repayment, the court must make its good faith determination in the light of all militating factors.

*Id.* at 1390.

MEMORANDUM OF DECISION - 5

## FACTS AND ANALYSIS

The Court is often charged with the difficult task of evaluating, under broad standards and general definitions and the "totality of the circumstances" whether there has been deception, dishonesty, or an abuse of the provisions, purpose or spirit of the Code. The Motion advanced by Creditors and the Trustee asks the Court to make such an evaluation, and to find such improper acts occurred.

In the Court's view of the evidence and arguments, the Motion focuses on two major issues or subjects. They are Debtor's disclosures and conduct related to (1) the Ethel Weiss Trust ("Trust"), and (2) Howe-Ronson Holdings, LLC ("Howe-Ronson").[2]

### A.    The Ethel Weiss Trust

Debtor's grandmother, Ethel G. Weiss, passed away.[3] Her Last Will and Testament, Ex. 1, provided a general bequest of personal property to her husband,

---

[2] The movants also address a number of other areas of alleged inadequate disclosure in Debtor's schedules and statements, though this miscellany pales in comparison with the two major subjects. The Court has considered these contentions, and Debtor's defenses and rejoinders, as it must under the "totality of the circumstances" standard. The Court concludes that these additional areas complained of by Creditors and the Trustee ultimately add little to the § 1307(c) arguments they advance in connection with the Trust and Howe-Ronson. Similarly, Debtor's explanations in regard to these other matters do not provide much help to his defense of the Motion on the two major issues.

[3] Debtor testified that he could not remember the exact date of his grandmother's death, but he believed she died in 1984. As will be noted later in this Decision, Ethel Weiss signed a lease in 1987 and an addendum to that lease in 1991. *See* Ex. C. Based on these documents, the Court believes Ethel Weiss passed away between 1991 and 1996, when her husband, Henry Weiss, died. (In 1998, Debtor began making distributions from the Trust. *See* Ex. 2.) It is possible that she died in 1992 as Ex. 1 bears a notation of a December, 1992 "filed" date. However, the exact date of her death is not material to the present discussion.

MEMORANDUM OF DECISION - 6

Henry Weiss. *Id.* at 1. She bequeathed all the balance of her estate, real and personal, in trust to Debtor as trustee. *Id.* at 2. Debtor was to administer this Trust for the benefit of Henry and then, upon Henry's death, distribute the balance of the Trust estate to Ethel's two children (25% each) and her five grandchildren (10% each). *Id.* at 2-3. In addition to acting as the trustee, Debtor was a 10% grandchild beneficiary.

The Trust corpus consisted primarily of a 600 acre farm. The farm is leased to a party who pays $28,500.00 every April 15th under a long term lease. *See* Ex. C (Rudd appraisal) at attachments (copy of 18 year lease between Henry and Ethel Weiss and Sickle G Ranch, Inc., signed by the Henry and Ethel Weiss and dated December 16, 1987). This lease is, thus, scheduled to terminate in December, 2005. Henry and Ethel Weiss also granted the lessee a "right of first refusal" in the event the property were to be offered for sale. *Id.* (copy of addendum to lease signed by Henry and Ethel Weiss and dated June 10, 1991).

Henry died in 1996. Though the Trust was to then terminate (*i.e.*, Debtor as trustee was instructed by Ethel's will that on Henry's death he "shall distribute" the balance of the Trust estate; *see* Ex. A at 2), Debtor did not do so. He testified that, after discussions with the Trust's attorney, he decided that terminating the long term lease or selling the property with the right of first refusal in place, would be contrary to the interests of the beneficiaries. Thus, he elected to keep the lease

MEMORANDUM OF DECISION - 7

in effect, and postpone ultimate disposition of the Trust's assets and distribution of the proceeds of those assets to beneficiaries until after the lease expired.[4]

In February 1998, Debtor, as trustee, obtained an appraisal of the assets of the Trust. *See* Ex. C. The appraiser considered the present value of the lease income stream and the reversionary interest of the property at lease termination, and arrived at a $670,000.00 present value. Debtor's personal interest at the time of the appraisal, before deducting costs of sale, equaled approximately $67,000.00. This appraisal also predicted that the value of the Trust asset in 2005 would be approximately $885,500.00. *Id.*

When Debtor filed his bankruptcy petition and schedules in December, 2004, he listed the value of his interest in the Trust at $2,600.00. He testified that this unequivocal statement in his sworn and signed schedules was a typographic error, and should have read $27,000.00.

However, even if Debtor intended to list the amount of $27,000.00 in his schedules, such a figure was far removed from what Debtor knew, from his role as trustee of the Trust and from his commissioned 1998 appraisal, to be an accurate valuation of his 10% interest as of late 2004.

Debtor attempted to justify, in theory, some number less than what the appraisal would otherwise indicate. He noted that water problems were

---

[4] However, as discussed below, and as reflected in Ex. 2, income from the lease was distributed by Debtor.

MEMORANDUM OF DECISION - 8

encountered on the farm ground.  *See*, *e.g.*, Exs. D - F.  While some adjustment in

the analysis of value might be supported by closer focus on water issues, Debtor

was unpersuasive in attempting to substantiate his original valuation of

$27,000.00.[5]

In January, 2005, Debtor amended the schedules to indicate, among other

things, that the 10% interest in the Trust had an "unknown" value.  See Ex. 20.

There is certainly some support for so indicating; the property interest is difficult

to evaluate given the lease, right of first refusal, and water questions.

Nevertheless, the entirety of the evidence indicates that hard information

concerning the asset and its value was begrudgingly offered.  The Trustee takes

the position that Debtor was not forthcoming and cooperative.

In addition to the value of the Trust and thus the value of the interests of the

several beneficiaries including Debtor, the Trust provided ongoing income

distributions as well.  As trustee, Debtor determined and directed distribution of

---

[5] First, though Debtor testified he was aware of water issues at the time he filed the
bankruptcy case and schedules in 2004, the third party analyses in these exhibits he now relies on
were all made and provided to Debtor in 2005.  There was no proof that he relied on third party
expert opinion in making his initial assertion.  Second, the revisiting of the value question by the
original appraiser, Rudd, indicated a potential 40% reduction in his earlier evaluation.  *See* Ex. D
at 2.  Whether applied to Rudd's 1998 value or his projected 2005 value, the resulting value of
Debtor's interest still exceeds the $27,000.00 he affirmatively represented.  Third, the Potter
analysis, Ex. E, though noting issues with water and the right of first refusal, nevertheless arrived
at values which would make Debtor's interest worth 2 or maybe 3 times as much as he had
indicated in his schedules.  And, fourth, this was not a situation where Debtor lacked access to
information to assist him in making an accurate valuation, as might be argued had he been merely
a passive, minority interest beneficiary.  Debtor instead was the sole trustee of the Trust, and
directly involved with it for a number of years.

MEMORANDUM OF DECISION - 9

the funds to himself and the other beneficiaries.  Exhibit 2 (and a duplicate exhibit,

Ex. G) indicates that, after Henry's 1996 death, Debtor received $16,520.00 over a

span of seven years, thus averaging approximately $2,300.00 per year.  The

exhibit establishes that Debtor received $2,800.00 in 2002; $2,500.00 in 2003; and

$1,800.00 in May, 2004.  *See id.*

Despite the receipt of these funds, Debtor indicated in his December, 2004

statement of financial affairs, response to question 2, that non-employment income

of "approximately $1,500.00/year" had been received from the Trust from 2002

through 2004.  *See* Ex. 19.[6]  This statement was not accurate based upon the

information Debtor had available to him, both as the recipient of the funds

indicated above, and as the trustee responsible to determine the size and timing of

distributions from the Trust.

Amendments were later made to the statement of financial affairs.  *See* Ex.

21 (January 14, 2005 amendment indicating receipt of income from the Trust of

$1,500.00 in 2002, $1,800.00 in 2003 and $1,800.00 in 2004).  These affirmative

statements, again, were not accurate, and understated the actual income received.[7]

A later amendment to Debtor's statement of financial affairs disclosed income

---

[6]  Debtor's original schedule I (current income of individual debtor), Ex. 19, does not
show any income to be received by Debtor from the Trust after bankruptcy.

[7]  In this exhibit is an amended schedule I, showing $125.00 per month ($1,500.00 per
year) to be received from the Trust.  This figure was not accurate based on historical distributions.
This projected figure remained the same even as of June, 2005.  *See* Ex. 25.

MEMORANDUM OF DECISION - 10

consistent with what Ex. 2 established was actually received.  *See* Ex. 22 (amendment of January 20, 2005).

### B.    Howe-Ronson

In his initial filing, Debtor disclosed that he held a 33% interest in Howe-Ronson, and asserted that the value of this interest was "$0".  *See* Ex. 19 at schedule B.  On January 14, 2005, he amended this schedule to indicate the value of his interest was "unknown."  Ex. 20.  In April, 2005, it was amended back to "$0".  Ex. 24.  In June, 2005, Debtor's next amendment asserted the 33% interest was worth $8,184.00.  Ex. 25; *see also* Ex. V, discussed further below.

Howe-Ronson is a limited liability company formed in June, 2004.  *See* Ex. K.  It was initially owned in equal 1/3 shares by Debtor, James Ryan and Cherri Ryan.[8]  *See* Ex. L.  The Ryans, Debtor, and one other individual were identified as "managers" of the LLC.  *Id.*

Minutes of an August, 2004, meeting indicate a change in the ownership structure of Howe-Ronson.  *See* Ex. M.  Debtor and the Ryans were designated as "Class A" members, with voting rights.  Debtor's interest in Howe-Ronson remained at 33%, and the Ryans' interests were each reduced to 16.5% of the

---

[8]  The Ryans were Debtor's business associates in Tactical Ordinance & Equipment Corporation ("TOE").  Creditors' pursuit of TOE, the Ryans and Debtor led to the present bankruptcy filing as well as that of TOE (Case No. 04-04422-TLM) and the Ryans (Case No. 04-04423-TLM).  *See generally* Doc. No. 37 (Decision discussing business, litigation history and other matters).

MEMORANDUM OF DECISION - 11

entity.  *Id.*  A new set of members, "Class B", consisted of Matthew Smith

(16.5%), Maxine Miller (11%) and James Ryan Sr. (6.5%).  Class B members had

no voting rights, but were to receive "preferential distribution of profits or loan

repayments in consideration for their investments."  *Id.*

Debtor paid $31,000.00 for his interest in Howe-Ronson in July, 2004.  Ex.

O.  Debtor cashed a certificate of deposit to generate the funds needed for this

investment.  *See* Ex. N.  His statement of financial affairs filed in December, 2004,

and his two amended statements in January, 2005 made no disclosures regarding

disposition of the CD, the receipt of non-business income, or the transfer of the

proceeds to acquire the Howe-Ronson interest.  *See* Exs. 19, 21, 22.

Howe-Ronson was formed to purchase real property for investment and

resale.  In fact, in August, 2004 it purchased an old school building in Emmett,

Idaho.  *See* Ex. R (warranty deed).

The property appears to have been purchased for approximately

$106,000.00.  Some $91,440.62 was paid in cash.  *See* Ex. Q (cashier's check of

August 2, 2004 to First American Title).  The purchase included the assumption

by Howe-Ronson of an obligation of the seller (Bell) to the Emmett, Idaho

Independent School District.  *See* Ex. S.  This obligation was in the original

principal amount of $16,000.00 and Debtor indicated the outstanding amount

assumed was approximately $13,500.00.

MEMORANDUM OF DECISION - 12

The source of the funds used to make the purchase, according to the testimony, were Debtor's $31,000.00 and the "loans" or "investments" of the Class B members, Smith and Miller. The bank account records of Howe-Ronson document the infusion of $25,000.00 in June 2004, and $38,000.00 in July, 2004, in addition to Debtor's $31,000.00. *See* Ex. T.[9] These funds, totaling $94,000.00, were used to purchase the cashier's check in August. *Id.*, *see also* Ex. Q.

Debtor could not produce any notes from Howe-Ronson to the "investors," nor any security documents to the benefit of the investors, nor any other documents reflective of a loan, much less a secured loan. Under the evidence presented, the only "secured" obligation on the property is the assumed $13,500.00 note to the School District.[10] Thus, the property has an apparent value of some $106,000.00, and equity after secured debt of some $93,000.00.

As noted, after several amendments, Debtor by June 2005 arrived at a $8,184.00 valuation. *See* Ex. 25. The assertion is based on an analysis Debtor shared with the Trustee. *See* Ex. V. In this May, 2005, letter, Debtor through

---

[9] Debtor testified that he believed the $25,000.00 came from Miller, who was Jim Ryan's mother-in-law, and the $38,000.00 came from Smith.

[10] Debtor attempts to defend his lack of documentation and limited knowledge by indicating that the Ryans were (at least recently) not cooperative or responsive to his requests for such material and information. The arguments were not particularly persuasive. Debtor did not address or justify his evident lack of knowledge concerning a very significant personal investment prior to the recent requests. Nor did he adequately explain his failure to take affirmative action, as a one third owner and a manager of the LLC, to demand and obtain the information he needed to respond in the instant litigation or, even more importantly, to protect his investment.

MEMORANDUM OF DECISION - 13

counsel asserted that there were "mortgages" of $75,000.00, reducing the total equity in the property to $31,000.00 and his share of that equity to about $8,000.00 net of selling costs. *Id.* There was no proof that such mortgages existed, nor any proof that any were reviewed prior to making this assertion to the Trustee.[11] In short, neither this letter nor any of the assertions in the schedules were supported by competent evidence.[12]

### C.   Other facts

As noted, Creditors and the Trustee make a number of other allegations of error and nondisclosure in Debtor's bankruptcy filings, and other arguments in support of their contention that the chapter 13 case was filed and has been prosecuted in bad faith. Given the foregoing, most of these other matters do not

---

[11] Given the priority of distribution shown in Ex. M, it is at least arguable that Debtor's interest in Howe-Ronson would equate to approximately $8,000.00 to $10,000.00. Class B members may be entitled to receive preferential distributions in consideration of their investments, thus distributing approximately $63,000.00 in equity and leaving Debtor with one third of the remaining value based on his one third interest in Howe-Ronson. However, it is also arguable that Debtor's interest is not so limited as there is no indication the other Class A members contributed anything to Howe-Ronson for their interests. The Court does not decide today what conclusions might be reached under applicable non-bankruptcy law, but notes instead that Debtor failed to provide the Trustee, the Court or his creditors with accurate information allowing each to make informed decisions as to the value of this asset. Instead, Debtor amended his valuations several times and made assertions of value based on inaccurate statements of fact.

[12] There is yet another problem with Debtor's view of Howe-Ronson. Assuming his investment is really worth around $8,000.00, he had no good answer for why he would invest $31,000.00 only to have his interest reduced and devalued by over two thirds in the space of a year. The arguments suffer further given that Debtor has paid "rent" while he has lived at the property, and those funds are used to service the School District's secured note. In addition, he has paid real property taxes on the property. These constitute yet further investments into the LLC – one that arguably is steadily devouring the value of his investment. Under these circumstances, that he has remained uninformed and passive in his dealings with the LLC is, if true, unreasonable.

MEMORANDUM OF DECISION - 14

warrant discussion.

The Court will observe, however, that Debtor has over a period of fully one-half a year made repeated amendments of the schedules and statements.  In addition to the matters addressed above, a review of these documents establishes other omissions and defects in disclosure which had to be corrected, some more than once.  Obtaining a clear and accurate view of the facts, or at least what Debtor would stand upon as the facts, has been a lengthy and frustrating process.  Creditors and the Trustee liken it to "pulling teeth" and note that this is antithetical to a debtor's well-established duty of full, complete and candid disclosure as well as the duties of § 521.

Additionally, in the context of this chapter 13 case, what Debtor proposes by way of a plan of reorganization is relevant.  Here, Debtor's latest plan proposes payments of $200.00 per month for 6 months and $286.00 per month for 30 months.  *See* Ex. 26.  The plan thus runs for the minimum period available under § 1322(d) and 1325(b)(1)(B).[13]  After consideration of the Trustee's fees, compensation to Debtor's counsel, and a classified student loan creditor, very little would be recovered by creditors generally.

**DISPOSITION**

Under the authorities set out previously in this Decision, and considering

---

[13]  The instant case predates the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, P. Law 109-8 (2005).

MEMORANDUM OF DECISION - 15

the totality of the evidence, the Court finds that cause for dismissal of this case as a bad faith filing has been established.  The BAP in *Ho* noted four primary factors. 274 B.R. at 876 (citing *Leavitt*, 171 F.3d at 1224).  Of those four, the Court concludes two are clearly present here:  (1) Debtor's misrepresentation of facts in the filing and attempts to unfairly manipulate the Code or otherwise advance the case and plan in an inequitable manner, and (2) egregious behavior.[14]

Debtor argued at hearing that "mistakes happen" and that "it's not a perfect world."  That is far too facile and sanguine an answer for what occurred here.[15]

The errors in disclosures regarding the Trust and Howe-Ronson were large in magnitude.  They were not promptly corrected.  Several were never made accurate.  Disclosures that were affirmatively made, such as the value of the Trust interest or the income received from the Trust, were belied by knowledge and

---

[14]  One factor weighs in favor of Debtor, that of prior filings and dismissals.  He had none.  The fourth factor is somewhat applicable: Debtor clearly filed to stay Creditors' state court litigation, and nothing in the record indicates that he would have sought bankruptcy relief but for that litigation.  However, many of the cases addressing this factor are factually distinguishable from the present one.  Certainly many debtors enter bankruptcy rather than spend the money on expensive civil litigation and take the risk of an adverse outcome.  Doing so is not per se improper and, were the two factors discussed in the text not present, the Court would not be inclined to find the § 1307(c) motion well taken solely for this one reason.

[15]  In addition to these arguments, Debtor, in his testimony, said he deferred to counsel in how he completed or amended certain of his sworn statements.  If Debtor is attempting to urge a defense of reliance on counsel, such defense cannot apply here since the errors were patent.  *See Kavanagh v. Leija (In re Leija)*, 270 B.R. 497, 503 (Bankr. E.D. Cal. 2001) (advice of counsel is not a defense when the erroneous information should have been evident or apparent to the debtor); *Palmer v. Downey (In re Downey)*, 242 B.R. 5, 15, 99.4 I.B.C.R. 165, 169 (Bankr. D. Idaho 1999) (attorney error won't absolve debtor from duty to ensure information is accurate and complete to the best of his knowledge) (citing *In re McLaren*, 236 B.R. 882, 897 (Bankr. D.N.M. 1999)); *Rakozy v. McGary (In re McGary)*, 91 I.B.C.R. 145, 147 (Bankr. D. Idaho 1991) (reliance on counsel must be in good faith; defense not available when error is self-evident).

MEMORANDUM OF DECISION - 16

information actually possessed by Debtor prior to the time of the disclosure.  In

each case of nondisclosure or inaccurate disclosure discussed above, the assets

were undervalued or the income understated.

In context, and with a view toward the totality of the conduct and behavior,

there were misrepresentations; they had the effect of manipulating the case to

Debtor's benefit and creditors' detriment; and the conduct was never cogently or

persuasively explained.

Cause having been established under § 1307(c), the Court must next

determine whether to dismiss the case or convert it to a chapter 7 liquidation.  *See*

*In re Henson*, 289 B.R. 741, 752-54 (Bankr. N.D. Cal. 2003) (noting that

§ 1307(c) requires a balancing test that must be applied on a case by case basis to

determine if the court should convert or dismiss, even if a creditor only advocates

one approach); *accord In re Osprey Mgmt. Corp.*, 97.1 I.B.C.R. 17 (Bankr. D.

Idaho 1997) (discussing the balancing test applicable in chapter 11 and citing *In re*

*Staff Inv. Co.*, 146 B.R. 256, 260 (Bankr. E.D. Cal. 1993)).  Section 1307(c)

requires the Court to convert or dismiss, "whichever is in the best interests of

creditors and the estate."  The existence of assets – the interest in the Trust, and

that in Howe-Ronson – and the nature of those assets, and Debtor's prior failure to

seek to protect, enforce and maximize those assets, are all strongly indicative that

conversion is in the best interests of creditors and the estate.  No particularly

MEMORANDUM OF DECISION - 17

compelling argument was advanced that, if cause existed under § 1307(c), the

interests of creditors and the estate would be best served by dismissal of the case.

**CONCLUSION**

      For the reasons indicated, and upon these findings and conclusions, the

Court determines that cause exists under § 1307(c), and that this case shall be

converted to a liquidation under chapter 7.  Counsel for Creditors may submit an

appropriate order.

DATED:  November 2, 2005

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 18

<u>CERTIFICATE RE: SERVICE</u>

A "notice of entry" of this Decision, Order and/or Judgment has been served on Registered Participants as reflected by the Notice of Electronic Filing. A copy of the Decision, Order and/or Judgment has also been provided to non-registered participants by first class mail addressed to:

Case No.  04-04424-TLM (Mark Allan Weiss)

     Mark Allan Weiss
     3600 Hanna Ave.
     Emmett, ID   83617

Dated:   November 2, 2005

<u>/s/ Jo Ann B. Canderan</u>
Judicial Assistant to Chief Judge Myers

MEMORANDUM OF DECISION - 19